**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

|  |  |
|---|---|
| TONI CONRAN individually and as Trustee of the CONRAN FAMILY TRUST, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Case No. _____ |
| v. | **CLASS ACTION COMPLAINT** |
| RAYMOND JAMES FINANCIAL, INC., | **JURY TRIAL DEMANDED** |
| RAYMOND JAMES FINANCIAL SERVICES ADVISORS, INC., | |
| and | |
| RAYMOND JAMES FINANCIAL SERVICES, INC., | |
| Defendants. | |

Plaintiff, on behalf of herself and the proposed Class defined herein, seeks redress for the harm caused by Defendants' conduct. In support of her Complaint, Plaintiff alleges the following:

## I.      NATURE OF THE ACTION

1.      This case concerns a simple ruse: instead of fulfilling its fiduciary duties, contractual obligations, and a regulatory mandate to act only in the best interests of its clients, Defendants implement a scheme whereby they use their clients' cash balances to generate massive profits for themselves while shortchanging their clients.

2.      Defendants' misconduct was extremely lucrative for themselves, but detrimental to their clients—in flagrant violation of their duties to their clients.

## II.      JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d). Members of the class are of a different state from one or more Defendants, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

4.      This Court has personal jurisdiction over Defendants because they conduct substantial business in this district.

5.      Venue is proper in this district under 28 U.S.C. § 1391.

6.      Venue is proper in this division of the Court under M.D. Florida Local Rule 1.04. Plaintiff is a citizen of Charlotte County, which is situated in the Fort Myers Division of this Court.

## III.      PARTIES

### A.      Plaintiff

7.      Plaintiff Toni Conran is a citizen of Punta Gorda, Florida, which is situated in Charlotte County.

8.      Plaintiff maintained a traditional IRA account (ending in 03) with Defendant Raymond James Financial Services, Inc. ("RJFS").

9.      Plaintiff is the Trustee of the Conran Family Trust, which was created July 12, 2012, and maintained a retail brokerage account (ending in 60) with RJFS (the "Trust").

10.      Plaintiff opened both accounts in 2016 and closed them both in 2024.

11.      The cash balances in Plaintiff's accounts were swept into one of Raymond James' cash sweep programs, the "Raymond James Bank Deposit Program," as defined below in Section IV.A.

2

A.      **Defendants**

12.     RJFS is a Florida corporation with its principal place of business within this District and is a registered broker-dealer with the SEC.

13.     RJFS is an introducing broker-dealer, which means that while RJFS is the registered broker dealer of record for client accounts, it does not hold client assets or settle trades on behalf of its clients.

14.     RJFS is the brokerage firm for Plaintiff's accounts that are the subject of this action.

15.     Raymond James Financial Services Advisors, Inc. ("RJFSA") is a Florida corporation with its principal place of business within this District.

16.     RJFSA is a registered investment advisor with the SEC and provided advisory services to Plaintiff.

17.     Raymond James Financial, Inc. ("RJ") is a Florida corporation with its principal place of business within this District.

18.     RJ is "a leading diversified financial services company providing private client group, capital markets, asset management, banking and other services to individuals, corporations and municipalities."[1] Further, RJ, "together with its subsidiaries, is engaged in various financial services activities, including providing investment management services to retail and institutional clients . . . ."[2]

19.     Through its wholly-owned subsidiaries, RJ provides financial consulting, wealth management, and advisory services to Plaintiff and other Class members, and it substantially assisted, encouraged, directed, participated in, and received the benefits of the wrongful conduct

---

[1]     Raymond James Financial, Inc., 2023 Annual Report (Form 10-K) at 1 (Nov. 21, 2023).

[2]     *Id.*

alleged herein that was conducted by RJFS and RJFSA.

20.     As used herein, the term "Raymond James" collectively refers to RJ, RJFS, and RJFSA.

## FACTUAL ALLEGATIONS

21.     Raymond James advertises, "No matter the business, we believe if we do what's right for clients, we'll help them achieve success while also realizing our own. It's that simple."[3]

22.     A significant source of income for Raymond James is net interest income. Net interest income is the difference between the amount of interest that Raymond James pays to or secures for the benefit of its clients and the amount of interest that Raymond James earns on those cash balances itself.

23.     Raymond James, like many financial services companies, offers "cash sweep" programs to its clients. Cash sweep programs figuratively "sweep" clients' cash balances into interest-bearing accounts at a network of banks.

24.     Raymond James makes more money when its clients' funds are invested in the Raymond James cash sweep programs rather than in similar cash options and equivalents because Raymond James' cash sweep programs offer unreasonably low interest rates.

25.     When clients are in the Raymond James cash sweep programs, Raymond James pays and/or secures interest rates on the client's cash balances that are neither reasonable nor in compliance with its legal duties.

---

[3]     About Us, Raymond James, available at https://www.raymondjames.com/about-us, (last viewed Aug. 1, 2024).

**A.**     **Raymond James' Sweep Programs**

26.     Raymond James has a primary cash sweep program for its brokerage clients known as its "Raymond James Bank Deposit Program" ("RJBDP"). The RJBDP is a multibank cash sweep program that deposits available cash in the client's brokerage account into interest-bearing deposit accounts at one or more banks in Raymond James' Bank Priority List (the "Priority Banks").

27.     Raymond James' contracts with the Priority Banks make the Priority Banks available for its clients' cash deposits. When a client's cash reaches applicable FDIC coverage limits at the first bank on the Priority Bank List, the client's cash will be deposited in the next bank on the Priority Bank List.

28.     If the client has an ERISA account or managed IRA, then the client's cash is ineligible for the RJBDP. Instead, the funds are kept in the RJBDP-Raymond James Bank Only ("RJBDP-RJ Bank Only") program, and client funds are swept exclusively to the Raymond James' bank affiliate.

29.     A client may also enroll in the Client Interest Program ("CIP") where a portion of cash in the CIP is placed in overnight repurchase agreements that are fully collateralized by U.S. Treasury Securities or deposited in qualifying trust accounts with major U.S. banks.

30.     The RJBDP, RJBDP-RJ Bank Only, and CIP cash sweep options each utilize the same Interest Rate Tiers and pay the same rate of interest on the cash balances within each Interest Rate Tier offered by Raymond James.

31.     As used herein, RJBDP, RJBDP-RJ Bank Only, and CIP are collectively referred to as Raymond James' "Sweep Programs."

32.     Raymond James fails to pay to or secure for its clients a reasonable rate of interest on the cash balances in its Sweep Programs.

33.     For example, as of August 1, 2024, the interest rates Raymond James paid to or secured for its clients' cash deposits in the Sweep Programs were:[4]

| From | To | Annual Percentage Yield |
|---|---|---|
| $0 | $99,999 | 0.25% |
| $100,000 | $249,999 | 0.50% |
| $250,000 | $999,999 | 1.00% |
| $1 million | $9,999,999 | 2.25% |
| $10 million | and above | 3.00% |

34.     The interest rates that Raymond James paid to or secured for its clients during the period that Plaintiff maintained accounts with Raymond James were materially the same as those set forth in the preceding paragraph.

35.     The interest rates Raymond James pays to or secures for its clients in the Sweep Programs violate Raymond James' duties to its clients because the rates are not reasonable, which constitutes a breach of Raymond James' fiduciary and contractual duties to its clients and falls below the standard of care set out in Regulation Best Interest, 17 CFR § 240.15l-1 (2019) (hereinafter "Reg. BI").

36.     Raymond James' continual sweep of Plaintiff's and the Class members' cash into the Sweep Programs during the entire period in which they held accounts with Raymond James constitutes a continuing wrong and was a continuing breach of Raymond James' duties to Plaintiff and the Class members. Each time Raymond James placed Plaintiff's and the Class members' cash into the Sweep Programs, Raymond James newly injured Plaintiff and the Class members.

---

[4]     Deposit Rates, Raymond James, available at https://www.raymondjames.com/client-resources/market-numbers/deposit-rates  (accessed Aug. 1, 2024).

**B.      Raymond James' Duties to Its Clients**

37.      Raymond James owes duties to its clients based on the type of relationship it has with the client.  For example:

    a.      for all retail brokerage advisory accounts (i.e., accounts managed by an investment adviser), Raymond James is required to act as a fiduciary to its clients, meaning it must act for the benefit of its clients and not its own self-interest, and

    b.      for all retail brokerage non-advisory client accounts (i.e., non-managed accounts), Raymond James is required to always act in the "best interests" of its clients.

**1.   Raymond James' Duties under the Advisers Act**

38.      When Raymond James acts as an Investment Adviser for client accounts, it owes its clients a fiduciary duty. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

39.      "The Advisers Act establishes a federal fiduciary duty for investment advisers. This fiduciary duty is based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act." *Id.*[5]

40.      Under this federal duty, Raymond James "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.*

41.      If there is a conflict between Raymond James' interests and its client's interests, then Raymond James is also required to "eliminate or make full and fair disclosure of all conflicts

---

[5]      *See also* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations, available at www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers (last viewed Aug. 1, 2024).

of interest which might incline an adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.*

42.     Raymond James "must make full and fair disclosure to its clients of all material facts relating to the advisory relationship." *Id.*

43.     Raymond James' fiduciary duties also include a duty of care to carry out its responsibilities in an informed and considered manner and to act as an ordinary prudent person would act in the management of her or her own affairs. In addition, because Raymond James becomes a fiduciary on the basis of representations of special skills or expertise, it is under a duty to use those skills and expertise for the benefit of its clients.

## 2.  Raymond James' Duties Under Regulation Best Interest (Reg. BI)

44.     Where Raymond James is acting in its capacity as a broker-dealer, it is obligated to act in its clients' "best interests" under Reg. BI.  17 C.F.R. § 240.15l-1.

45.     Reg. BI incorporates "key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing specific requirements to address certain aspects of the relationships between broker-dealers and their retail clients." 84 Fed. Reg. 33318, 33320.  Reg. BI and common law principles of fiduciary obligations "generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."[6]

46.     Under Reg. BI, regardless of whether an investor chooses a broker-dealer or an investment adviser (or both), the investor "will be entitled to a recommendation … or advice … that is in the best interest of the retail investors and that does not place the interests of the firm or

---

[6]     SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations (June 7, 2024), available at www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers.

the financial professional ahead of the interests of the retail investor." 84 Fed. Reg. 33318, 33321.

47.     Reg. BI consists of a "General Obligation," which states, "When making a recommendation, a broker-dealer must act in the retail customer's best interest and cannot place its own interests ahead of the customer's interests." 84 Fed. Reg. 33318, 33320.

48.     Within the General Obligation are more specific duties, including disclosure duties and a duty to avoid and disclose conflicts of interest.

49.     These specific duties require disclosure of "all material facts relating to conflicts of interest … that might incline a broker-dealer to make a recommendation that is not disinterested, including, for example, conflicts associated with proprietary products, payments from third parties, and compensation arrangements." 84 Fed. Reg. 33318, 33321.

50.     Part of a broker-dealer's obligation under Reg. BI is to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation." 84 Fed. Reg. 33318, 33321.

51.     One component of a broker-dealer's duty to disclose conflicts of interest concerns compensation. "The receipt of higher compensation for recommending some products rather than others, whether received by the broker-dealer, the associated person, or both, is a fundamental and powerful incentive to favor one product over another." 84 Fed. Reg. 33318, 33364.

52.     Pursuant to Reg. BI, Raymond James was required to act in the best interests of its clients when recommending an account type to its clients, including "understanding of the characteristics of a particular type of account [and] should consider, without limitation, factors such as the services and products provided in the account (including ancillary services provided in

conjunction with an account type)."[7]

53.    The SEC recently reiterated that compensation, revenue, and other benefits from cash sweep programs give rise to a conflict of interest for both broker-dealers and investment advisers.[8]

54.    Raymond James' default placement of Plaintiff's and the Class members' cash into the Sweep Programs constitutes a "recommendation" within the scope of Reg. BI, and as a result, Raymond James was required to act in the best interests of its client when making that recommendation.

55.    Under Reg. BI, Raymond James was and is obligated to elevate its clients' interests above its own, to avoid conflicts with clients' interests, and to disclose material facts concerning any conflicts that may exist.

**C.    Raymond James' Contractual Duties**

56.    Raymond James' relationship with its clients is also governed by a written contract, the terms of which are contained in, and incorporated into, various standardized documents drafted by Raymond James.

57.    One such document, titled Important Client Information ("Client Disclosure"), governs the operations of Raymond James' Sweep Programs.[9]

---

[7]    *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Account Recommendations for Retail Investors (June 7, 2024), https://www.sec.gov/tm/iabd-staff-bulletin.

[8]    *See* Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflict of Interest (June 12, 2024), available at https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

[9]    Raymond James also refers to this document as "Important Disclosures about Raymond James' Cash Sweep Programs." Raymond James Bank Deposit Program, Raymond James, available at https://www.raymondjames.com/wealth-management/advice-products-and-services/banking-and-lending-services/cash-management/cash-sweeps/raymond-james-bank-deposit-program (accessed Aug. 12, 2024).

58.    The Client Disclosure requires Raymond James to pay its clients a "reasonable rate of interest" on all cash deposits in the RJBDP-RJ Bank Only cash sweep option.[10] Thus, Raymond James is contractually obligated to pay a reasonable rate on its clients' cash deposits in the RJBDP-RJ Bank Only.

59.    Because the Client Disclosure also states: "Accounts enrolled in RJBDP, RJBDP-RJ Bank Only, and CIP each utilize the same Interest Rate Tiers and pay the same rate of interest on the cash balances within each Interest Rate Tier,"[11] Raymond James is also contractually obligated to pay a reasonable rate on its clients' cash deposits in the RJBDP and in the CIP.

60.    Additionally, the Client Disclosure incorporates Reg. BI by reference and states that it is "required to act in the best interest of a retail client . . . at the time they recommend any securities transaction or investment strategy involving securities (including account-type recommendations)."[12]

**D.    Raymond James Breaches Its Duties and Profits Thereby**

61.    Raymond James breaches its duties to pay or secure reasonable interest rates for its clients' cash deposits.

62.    Although Raymond James does not define the term "reasonable," according to the term's dictionary definition, it is synonymous with "fair" and "proper."[13]

---

[10]    Important Client Information, Raymond James, at p. 46 (June 29, 2024), available at https://www.raymondjames.com/-/media/rj/dotcom/files/legal-disclosures/ici_rja_icd_fid.pdf.

[11]    *Id.* at p. 43.

[12]    *Id.* at p. 3.

[13]    *See* Reasonable, Black's Law Dictionary (12th ed.).

63.   IRS regulations define an "arm's-length interest rate" as:

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

64.   Similarly, in 2003, the Department of Labor provided the following definition of a "reasonable" rate of interest when issuing an exemption to certain transaction restrictions:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other clients of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, at 34648 (June 10, 2003).

65.   Under any definition of the term, Raymond James did not pay or secure "reasonable" rates of interest to Plaintiff and proposed Class members.

66.   The rates offered by Raymond James through its Sweep Programs are significantly lower than sweep programs at other firms. For example, the following chart compares Raymond James' Sweep Programs' rates with those of three comparable programs:

| Cash Balance | Raymond James' Sweep Programs' Rates[14] | Vanguard Sweep Rate[15] | Interactive Brokers Sweep Rate[16] | Fidelity Sweep Rate[17] |
|---|---|---|---|---|
| Under $100,000 | 0.25% | 4.6% | 4.83% | 4.98% |
| Between $100,000 and $249,999 | 0.50% | 4.6% | 4.83% | 4.98% |
| Between $250,00 and $999,999 | 1.00% | 4.6% | 4.83% | 4.98% |
| Between $1 million and $9,999,999 | 2.25% | 4.6% | 4.83% | 4.98% |
| $10 million and above | 3.00% | 4.6% | 4.83% | 4.98% |

67.    Thus, other financial institutions that use sweep programs pay or secure significantly higher rates than Raymond James.

68.    Money market fund rates also provide a benchmark for determining what constitutes a "reasonable rate" and / or a reasonable alternative investment for clients' cash.

69.    Some of Raymond James' competitors automatically sweep any uninvested cash deposited in its clients' accounts into money market funds that earn comparably high rates of

---

[14]    Deposit Rates, Raymond James, available at https://www.raymondjames.com/client-resources/market-numbers/deposit-rates  (accessed Aug. 1, 2024).

[15]    *See* Vanguard Cash Plus Account, available at https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account  (last viewed Aug. 1, 2024).

[16]    *See* Safeguard Your Assets with Our Insured Bank Deposit Sweep Program, https://www.interactivebrokers.com/en/accounts/sweep-program.php (last viewed June 20, 2024); Interest Rates, available at https://www.interactivebrokers.com/en/accounts/fees/pricing-interest-rates.php, (last viewed Aug. 1, 2024).

[17]    Help your cash work harder, Fidelity, available at https://www.fidelity.com/go/manage-cash-rising-costs (last viewed Aug. 1, 2024).

interest. For example, by default, Fidelity sweeps uninvested cash in its retail clients' accounts into a money market fund currently earning approximately 5%.[18]

70.     Likewise, competing firms Vanguard and Interactive Brokers offer cash sweep rates of 4.6% and 4.83% respectively.

71.     In contrast, Raymond James Sweep Programs offer as little as 0.25% for Plaintiff and Class members.

72.     Raymond James has devised a scheme by which it generates significant profits using clients' cash balances.  The scheme is devised to maximize profits for Raymond James while at the same time disregarding its clients' best interests—in fact, Raymond James generates interest income on its clients' cash balances that are multiples greater than the client receives.

**E.     Raymond James Benefits from Its Misconduct**

73.     Raymond James earns interest revenue on non-trading assets that it holds for its clients; this includes cash deposits and other capital that is not deployed for trading purposes.

74.     The difference between what Raymond James earns on the deposits in the Sweep Programs and what it pays its clients is the company's net interest income.

75.     Raymond James' net revenue is heavily impacted by its net interest income.

76.     For example, in 2023, Raymond James' "combined net interest income and RJBDP [Raymond James Bank Deposit Program] fees from third-party banks increase[ed] [by] $1.47 billion."[19]

77.     According to Raymond James' own analysis, a change in interest rates may cause significant change in the company's net interest income. As Raymond James reports, "given . . .

---

[18]     *See* Help your cash work harder, Fidelity, available at https://www.fidelity.com/go/manage-cash-rising-costs (last viewed Aug. 1, 2024).

[19]     Form 10-K, Raymond James Financial, Inc., at p. 44 (Sep. 30, 2023).

the nature of fees we earn from third-party banks on client cash balances swept to such banks as part of the RJBDP (included in account and service fees), our financial results are sensitive to changes in interest rates."[20]

78.    Raymond James also reports that "[i]nterest rate changes could also adversely affect the value of our fixed income trading inventories, as well as our net interest spread, which is the difference between the yield we earn on our interest-earning assets and the interest rate we pay for deposits and other sources of funding, in turn impacting our net interest income and earnings."[21]

79.    And as Raymond James further reports, the change in net interest is a "material risk" and "[i]nterest rate changes could also adversely affect the value of . . . our net interest spread."[22]

80.    Thus, Raymond James has a significant financial interest in (1) not paying clients a reasonable interest rate and keeping as much of the "spread" as it can, and simultaneously (2) not reasonably disclosing to its clients the unreasonable interest rates it pays and the possible alternatives for those cash balances which would benefit the clients, but which would be to the detriment of Raymond James.

## V.    CLASS ACTION ALLEGATIONS

81.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

82.    Plaintiff brings this class action and seeks certification of the following Class:

**Retail clients of Raymond James who had cash deposits or balances in Raymond James' Sweep Programs.**

---

[20]    *Id.* at p. 58.

[21]    *Id.* at p. 25.

[22]    *Id.*

83.     Excluded from the Class are governmental entities, institutional and other non-retail investors; Raymond James and any of its affiliates, legal representatives, employees, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiff and the proposed Class, including other attorneys and staff at each respective firm.

84.     This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**Numerosity**
**Rule 23(a)(1)**

85.     Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time. However, Raymond James provides financial planning and investment-related services nationwide with approximately 8,800 financial advisors and $1.48 trillion in client assets.[23] Accordingly, Plaintiff and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**Existence and Predominance of Common Questions of Law and Fact**
**Rule 23(a)(2), 23(b)(3)**

86.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

    a.     whether the interest rates paid to or secured for Raymond James' retail clients in Raymond James' Sweep Programs are "reasonable;"

    b.     whether Raymond James owed a fiduciary duty to the Class, and whether Raymond

---

[23]     By the Numbers, Raymond James, available at https://www.raymondjames.com/about-us/by-the-numbers (accessed Aug. 1, 2024).

James violated that duty;

c.   whether Raymond James owed a duty to the Class related to its IRA programs offered to retail clients, and whether Raymond James violated that duty;

d.   whether Raymond James breached its contracts with Plaintiff and members of the Class;

e.   whether Raymond James was unjustly enriched by its wrongful conduct;

f.   whether and to what extent Class members are entitled to damages and other monetary relief; and

g.   whether and to what extent Class members are entitled to attorneys' fees and costs.

### Typicality
### Rule 23(a)(3)

87.   Plaintiff's claims are typical of the Class's claims because Plaintiff's accounts were retail accounts with Raymond James that received an unreasonable interest rate on their cash sweep balances. Thus, Plaintiff's claims are typical of other Class members' claims as they arise from the same course of conduct by Defendants, and the relief sought is common to Class members.

### Adequacy of Representation
### Rule 23(a)(4)

88.   Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

### Superiority
### Rule 23(b)(3)

89.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual

Class members are small compared with the burden and expense required for each Class member to individually litigate their claims against Defendants. It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs done to them.

90.    Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

91.    Superiority is particularly satisfied in these circumstances, where the law of a single state will apply to all state law claims. Under the uniform contract terms with Raymond James, the law of Florida will apply to each Class member's state law claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

92.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

    b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

### VI.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**Brought on Behalf of the Class Against All Defendants**

93.    Plaintiff, on behalf of herself and the Class, re-alleges the paragraphs above as if fully set forth herein.

94.    Raymond James owed fiduciary duties to Class members who maintained cash deposits or balances in Raymond James' Sweep Programs (including IRAs).

95.    Raymond James' fiduciary duties include, but are not limited to:

a.   a duty of undivided loyalty;

b.   a duty to act in the best interests of its clients;

c.   a duty of care;

d.   a duty not to place Raymond James' interests above those of its clients;

e.   a duty to avoid conflicts of interest; and

f.   a duty to disclose any conflicts of interest.

96.    Raymond James violated each of the foregoing duties when it: (1) failed to pay to or secure for Plaintiff and the Class a reasonable rate of interest; (2) failed to act in Plaintiff's and the Class's best interests by not providing a reasonable default for cash balances that paid its clients a reasonable rate of interest on cash balances; (3) placed its own interests in realizing financial gain from net interest income ahead of the Class's interest in obtaining a reasonable rate of interest; (4) maintained and failed to reasonably disclose its conflict of interest in securing increased net

interest income at the expense of its clients; and (5) failed to recommend to Plaintiff and the Class a cash sweep program that would pay a reasonable rate of interest

97.     Raymond James' conduct damaged Plaintiff and the Class.

98.     Plaintiff, individually and on behalf of the Class, seeks all damages permitted by law.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**Brought on Behalf of the Class Against All Defendants**

99.     Plaintiff, on behalf of herself and the Class, re-alleges the paragraphs above as if fully set forth herein.

100.    As a result of Raymond James' wrongful conduct, Plaintiff and the Class received lower interest payments on their cash and other deposits than they would have in a reasonable and fair market.

101.    As a result of Raymond James' wrongful conduct, Raymond James was unjustly enriched, and Plaintiff and the Class conferred a benefit upon Raymond James because Raymond James received significantly greater net interest income than it would have but for its wrongful conduct.

102.    Raymond James appreciated, knowingly accepted, and retained the non-gratuitous benefits conferred by Plaintiff and the Class.

103.    It would be inequitable and unjust for Raymond James to retain these wrongfully obtained benefits.

104.    Raymond James' retention of these wrongfully obtained benefits would violate fundamental principles of justice, equity, and good conscience.

105.    Plaintiff and the Class are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest.

## THIRD CLAIM FOR RELIEF
### Breach of Contract—Express Provisions
### Brought on Behalf of the Class Against All Defendants

106.    Plaintiff, on behalf of herself and the Class, re-alleges the paragraphs above as if fully set forth herein.

107.    Raymond James breached its contractual obligations to Plaintiff and the Class by failing to pay a "reasonable rate of interest" on their cash deposits.

108.    Raymond James breached its contractual obligations to Plaintiff and the Class by failing to act in the best interests of Plaintiff and the Class.

109.    Raymond James' breaches of contract damaged Plaintiff and the Class.

110.    Plaintiff, individually and on behalf of the Class, seeks all damages permitted by law.

## VII.    DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, demands judgment and relief as follows:

1.  For an order certifying the proposed Class, and appointing Plaintiff and her counsel to represent the proposed Class;

2.  For an order awarding Plaintiff and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

3.  For an order awarding Plaintiff and Class members restitution, disgorgement, or such other and further relief as the Court deems proper; and

4.  For an order awarding Plaintiff and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## VIII.   JURY TRIAL DEMAND

Plaintiff, on behalf of herself and the Class, demands a trial by jury on all issues so triable.


DATED: August 26, 2024

/s/      *Juan P. Bauta II*
Juan P. Bauta II          FL Bar No.: 894060
**SIMMONS HANLY CONROY LLP**
One Court Street Alton, IL 62002
Telephone: (618) 259-2222
Facsimile (618) 259-2251
jbauta@simmonsfirm.com

and

Thomas I. Sheridan, III
Sona R. Shah
**SIMMONS HANLY CONROY LLP**
112 Madison Avenue
New York, NY 10016 Telephone:
(212) 784-6404 Facsimile:
(212) 213-5949
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

and

Matthew L. Dameron
Clinton J. Mann
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:      (816) 945-7110
Facsimile:      (816) 945-7118
matt@williamsdirks.com
cmann@williamsdirks.com

and

Bruce D. Oakes
Richard B. Fosher
**OAKES & FOSHER, LLC**
1401 Brentwood Boulevard, Suite 250
Saint Louis, Missouri 63144
Telephone:     (314) 804-1412
Facsimile:      (314) 428-7604
boakes@oakesfosher.com
rfosher@oakesfosher.com

***Counsel for Plaintiff and the Proposed Class***